UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TRINA SIMPKINS**,                                    Case No. 1:12 CV 640

        Plaintiff,                            Magistrate Judge James R. Knepp II

    v.                                             MEMORANDUM OPINION AND
                                                       ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

### INTRODUCTION

Plaintiff Trina Simpkins seeks judicial review of Defendant Commissioner of Social Security's decision to deny Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### BACKGROUND

On February 23, 2010, Plaintiff filed applications for DIB and SSI stating she was disabled due to bipolar depression and alleging a disability onset date of October 1, 2008. (Tr. 109, 111, 130). Her claims were denied initially (Tr. 57, 60) and on reconsideration (Tr. 68, 72). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 81). Born August 4, 1986, Plaintiff was 22 years old when the hearing was held on August 4, 2011. (Tr. 23, 27). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 18, 23).

Vocational and Medical History

Plaintiff graduated from high school and completed less than a year of college. (Tr. 28). Her past work consists of seasonal or short-term positions. (Tr. 132, 138).

On November 9, 2007, Plaintiff's psychiatric exam was normal when she went to the emergency room after passing out. (Tr. 210–12). At this point, it turned out Plaintiff was pregnant. (Tr. 215). On June 4, 2008, Plaintiff underwent an emergency Cesarean section to deliver her daughter. (Tr. 188–89). Her psychiatric exam was negative for sleep disturbance, anxiety, memory loss, disorientation, inattention, or feelings of depression. (Tr. 193).

On October 26, 2009, Salma Ahmad assessed Plaintiff for mental health treatment after she got into a violent incident resulting in trouble with the court. (Tr. 266). The court ordered Plaintiff to seek mental health treatment, and it was the first time she ever sought mental health treatment. (Tr. 266). Plaintiff stated she needed help with depression and anger. (Tr. 266). She reported a fluctuating appetite and difficulty sleeping at times. (Tr. 266). She reported she had not worked for a year, explaining her previous employment was a temporary customer services job and she was laid off after a few months. (Tr. 266). Plaintiff reported she had behavioral problems in school and was suspended many times. (Tr. 266). She also reported using marijuana approximately once a week. (Tr. 267). At the time, Plaintiff was pregnant and had a sixteen month old daughter. (Tr. 266–67).

Plaintiff reported episodes of depression, lack of control over her emotions, irritability, anger, easy frustration, difficulty sleeping, and crying spells. (Tr. 267). She reported past suicidal thoughts but no plans. (Tr. 267). Plaintiff said she had experienced depression for a long time but it became much worse over the past several years. (Tr. 267). She reported feelings of worthlessness,

2

hopelessness, and helplessness. (Tr. 268). Plaintiff's mood was somewhat depressed and irritable and she made minimal eye contact. (Tr. 267). She was withdrawn and passive, with brief, vague responses. (Tr. 267). Additionally, "[s]he [e]xhibited poor insight as evidenced by her use of marijuana while on probation and being pregnant." (Tr. 267). Dr. Ahmad diagnosed depressive disorder not otherwise specified, rule out cannabis abuse. (Tr. 267).

Plaintiff first saw psychiatrist Dr. Richard Hill on November 23, 2009, chiefly complaining of anger issues. (Tr. 298). She explained she had been court-ordered to seek mental health treatment after she became angry and broke a window with a cinder block. (Tr. 298). Plaintiff reported some past violent behavior, including two episodes of cutting herself, and also explained she does not do well alone and needs to have somebody close. (Tr. 298). Plaintiff exhibited a rapidly shifting sense of self and a history of reckless behavior, improved in the past two years. (Tr. 298). Plaintiff also reported feelings of emptiness and intense anger. (Tr. 298). She rated her depression as a seven to eight out of ten and reported a history of suicidal ideation but none for the past several months. (Tr. 298). Plaintiff felt her future was unpredictable but wanted to be happy, wanted her daughter to be happy, and wanted to have a career. (Tr. 298). At the time, Plaintiff was four and a half months pregnant but planned to terminate the pregnancy due to emotional and financial reasons. (Tr. 298). Overall, Plaintiff's mood was euthymic and somewhat reserved. (Tr. 299). She was cooperative and pleasant, with intact concentration and attention, logical and goal-directed thought processes, and intact insight and judgment. (Tr. 299). Dr. Hill diagnosed mood disorder not otherwise specified, rule out borderline personality disorder. (Tr. 300). He felt borderline personality disorder was the underlying issue, but held off on prescribing medication due to Plaintiff's pregnancy. (Tr. 300).

On December 28, 2009, Plaintiff attended an initial counseling session with Mary Margaret

3

Hyland. (Tr. 294). Plaintiff reported she was "kinda glad" the court referred her to counseling because she believed she needed help with her anger. (Tr. 294). Plaintiff spoke at length about her anger issues and said her daughter made her happy and she had a relatively good relationship with her mother. (Tr. 294). She reported sometimes she was "not happy [she] even woke up". (Tr. 294). Initially, Plaintiff thought her depressed mood was due to her pregnancy, but it had not improved after she terminated the pregnancy. (Tr. 294). She said she had not felt happy for a long time and rated her depression as an eight out of ten. (Tr. 294). Plaintiff also reported past suicidal ideation but no current ideation or intent. (Tr. 294). She reported crying, feelings of worthlessness, anger, irritability, difficulty sleeping, changes in appetite, and lack of interest. (Tr. 294).

Plaintiff saw Dr. Hill on January 4, 2010, reporting she had terminated her pregnancy. (Tr. 293). She was doing "ok" but felt more irritable and unsettled. (Tr. 293). Plaintiff said she was sleeping only four to five hours per night, had a decreased appetite, experienced racing thoughts, and lashed out at her family. (Tr. 293). Plaintiff appeared somewhat angry but was cooperative, appropriate, logical, and goal-directed. (Tr. 293). She denied suicidal or homicidal ideation, paranoia, or hallucinations. (Tr. 293). Plaintiff did report depressed mood, feelings of worthlessness, and an inability to get herself out of her predicament. (Tr. 293). Dr. Hill prescribed Seroquel to treat Plaintiff's symptoms. (Tr. 293).

Plaintiff cancelled her January 19, 2010 counseling session with Hyland due to a conflict with her job training program. (Tr. 240). On February 1, 2010, Plaintiff attended counseling with Hyland. (Tr. 240). She was 25 minutes late because of her job readiness program, and her mood was anxious and depressed. (Tr. 240). Plaintiff reported she was taking her medication and felt it was helping her mood swings, but she was still depressed and expressed little interest in anything except

4

her daughter. (Tr. 240). She also stated she had difficulty sleeping due to anxiety. (Tr. 240). Additionally, Plaintiff reported memory problems and difficulty organizing and remembering her appointments. (Tr. 240).

On February 2, 2010, Plaintiff returned to Dr. Hill. (Tr. 239). She reported slight improvement in her mood symptoms and felt her medication was working, but not enough. (Tr. 239). She also indicated her difficulty sleeping had improved slightly. (Tr. 239). Plaintiff appeared somewhat angry and reported frustrating easily, but she was cooperative, logical, and goal-directed. (Tr. 239). She denied any cyclicity to her mood and frustration and reported a depressed mood, feelings of worthlessness, and an inability to get herself out of her predicament. (Tr. 239). In response to her continued symptoms, Dr. Hill increased Plaintiff's Seroquel dose. (Tr. 239).

On February 25, 2010, Plaintiff attended counseling with Hyland. (Tr. 238). She said her goal was "to be able to handle everyday tasks without feeling . . . overwhelmed or depressed. (Tr. 238). Plaintiff's mood was depressed, with a congruent affect. (Tr. 238). Her thought process was intact and she made good eye contact. (Tr. 238). She reported feeling "kinda fatigued", explaining she had difficulty sleeping. (Tr. 238). She stated she has a loss of appetite, but also said she had "so much going on [she] forg[ot] to eat sometimes", though she knew this was not healthy. (Tr. 238). Plaintiff reported she was taking Seroquel as prescribed. (Tr. 238). She also reported suicidal thoughts but denied plan or intent. (Tr. 238). Plaintiff told Hyland she sometimes questioned whether she would ever feel a sense of purpose in her life and sometimes felt like giving up on everything. (Tr. 238). Plaintiff said she used to go out with friends and have a social life, explaining her whole personality had changed. (Tr. 238). She described herself as irritable and angry and began to cry. (Tr. 238). She also expressed concerns about being a good parent and felt overwhelmed by

5

negative thoughts and anxiety. (Tr. 238). Plaintiff stated she needed more time for herself and agreed with Hyland's suggestion to go out with her friends when they invited her places. (Tr. 238).

On March 18, 2010, Plaintiff failed to show up for an appointment with Hyland. (Tr. 238). Plaintiff also cancelled an appointment with Hyland on March 25, 2010, stating she was ill. (Tr. 284). Hyland's notes from April 5, 2010 indicated she left a message for Plaintiff to try to reschedule the appointment and explained she had not seen Plaintiff in a number of weeks. (Tr. 265).

On May 12, 2010, Plaintiff attended counseling with social worker Mary Brahm and reported significant feelings of depression and anxiety. (Tr. 263). Plaintiff continued to report a desire to be able to cope with everyday tasks without feeling overwhelmed and depressed. (Tr. 263). Her mood was anxious and she reported racing thoughts, which interfered with the counseling session. (Tr. 263). She reported her depression as a five or six out of ten, but stated she was having a "better day today." (Tr. 263). Plaintiff said her medication was helping but she had difficulty focusing. (Tr. 263). Plaintiff also stated she needed to attend a Job Readiness Class to keep her benefits, and she worried her symptoms would interfere with her ability to complete the classes. (Tr. 281). She was motivated to work but feared her symptoms would interfere with working a job and reported an inability to control her mood swings. (Tr. 281).

When Plaintiff saw Dr. Hill on June 1, 2010, she again reported medication helped but was "perhaps not sufficient to control her mood." (Tr. 261). She also felt less irritable and had fewer mood swings since Dr. Hill increased her Seroquel dosage, but still felt there was room to improve. (Tr. 261). Plaintiff apologized for missing past appointments, citing transportation issues. (Tr. 261). She denied any dangerous thoughts, denied psychosis, and said she was taking her medication as prescribed. (Tr. 261). Dr. Hill once again increased her Seroquel dosage. (Tr. 261).

On June 15, 2010, Plaintiff missed a counseling appointment with Brahm and rescheduled due to illness. (Tr. 260, 278). When Plaintiff saw Brahm on June 21, 2010, her mood was anxious and she reported racing thoughts. (Tr. 277). She also indicated difficulty making decisions. (Tr. 277). Plaintiff spoke with Brahm on August 6, 2010, reporting she had been kicked out of her job training classes and lost her benefits. (Tr. 273). Her mini mental status examination was within normal limits. (Tr. 273). Plaintiff reported feeling depressed and wanted to meet with Brahm, but she missed her appointment on August 13, 2010. (Tr. 272–73).

On September 14, 2010, Plaintiff saw Dr. Hill for the first time since June. (Tr. 270). Notes indicate she took Seroquel "fairly consistently" but her dosages varied. (Tr. 270). Plaintiff reported she was irritable, isolative, and lashed out at others. (Tr. 270). She stated she often felt depressed and stayed in bed all day, having her mother care for her child. (Tr. 270). Plaintiff also reported crying spells, oversleeping, and overeating. (Tr. 270). Dr. Hill's notes indicated Plaintiff stopped seeing Brahm for counseling, and Plaintiff explained she cut everything – including counseling – out of her life. (Tr. 270). Plaintiff's mood was depressed and she was tearful, angry, and irritable, but she was also logical, goal-directed, articulate, and expressed herself well. (Tr. 270). Dr. Hill did not believe Plaintiff presented a convincing picture of bipolar disorder. (Tr. 270). He started her on Celexa, referred her to psychotherapy, and urged her to comply with treatment. (Tr. 270).

Plaintiff next saw Dr. Hill on November 8, 2010, reporting Celexa had not provided a benefit. (Tr. 315). Plaintiff also stated she did not like socializing and became easily frustrated. (Tr. 315). She was sleeping six to seven hours per night and reported her child's father helped quite a bit with child care. (Tr. 315). Plaintiff said she was glad to have him to help so she could "go blow off steam rather than act out in front of [her daughter]." (Tr. 315). At the appointment, Plaintiff

presented with a depressed, tearful mood and was angry and irritable, but she denied suicidal or homicidal ideation, was logical and goal-directed, and expressed herself well. (Tr. 315). Dr. Hill increased Plaintiff's Celexa dose and Plaintiff agreed to enter psychotherapy with Brahm. (Tr. 315).

On March 4, 2011, counseling records documented Plaintiff's history of not showing for appointments after referral. (Tr. 307). Plaintiff's treatment program was terminated at this time. (Tr. 307–08). Her GAF at discharge was a 55 – unchanged from her GAF at admission. (Tr. 308).[1] At admission and discharge, she had moderate emotional, behavioral, and cognitive conditions and complications. (Tr. 309).

On March 7, 2011, Plaintiff attended a psychiatric evaluation with Dr. John Wilhelm. (Tr. 317). Dr. Wilhelm described Plaintiff as a 24-year-old woman with a history of bipolar disorder. (Tr. 317). Plaintiff stated antidepressants never totally controlled her symptoms. (Tr. 317). Plaintiff reported she still had some significant depression and had been off her medications since December 2010, when she found out she was pregnant. (Tr. 317). Her son was born prematurely in January 2011. (Tr. 317). Plaintiff stated that since being off her medications, she experienced significant mood swings and irritability. (Tr. 317). She did not want to talk to or see anyone, felt overwhelmed, experienced racing thoughts and crying spells, and experienced panic attacks up to three times per week. (Tr. 317). Plaintiff reported occasional suicidal ideation, stating she overdosed in the summer but did not have a plan to commit suicide. (Tr. 317). Additionally, Plaintiff stated she had a hard

---

1. The GAF scale represents a "clinician's judgment" of an individuals symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 32–34.

time enjoying former pastimes, had little energy, and had a variable appetite. (Tr. 317). Plaintiff was

pleasant and engaging, "although she did appear mildly stressed" and teared up several times. (Tr.

318). Dr. Wilhelm diagnosed Plaintiff with bipolar disorder type two and assigned a GAF of 45. (Tr.

318). He told Plaintiff to resume taking Seroquel once she stopped breast feeding, and added

Depakote. (Tr. 318).

Opinion Evidence

On March 29, 2010, consulting psychologist Dr. Robelyn Marlow assessed Plaintiff's mental

residual functional capacity (RFC). (Tr. 241–43). Dr. Marlow found no evidence of limitation or

found Plaintiff was not significantly limited in all areas of functioning except the following, in

which he opined Plaintiff had moderate limitations: maintaining attention and concentration for

extended periods; completing a normal workday and workweek without interruptions from

psychologically based symptoms; performing at a consistent pace without an unreasonable number

and length of rest periods; interacting appropriately with the general public; and responding

appropriately to changes in the work setting. (Tr. 241–42).

Dr. Marlow noted no medical evidence about Plaintiff's mental condition existed for the

period between her alleged onset date and date last insured. (Tr. 243). He also stated Plaintiff's

symptoms were likely exacerbated by stressful situations, she needed a work environment without

strict production demands and with few changes, she could carry out one to three step tasks, and she

could relate superficially to others but could not work with the public. (Tr. 243). Though Plaintiff's

statements were credible, Dr. Marlow found she could complete most of her daily activities despite

her symptoms, and he noted her treating source had not provided any work-related limitations. (Tr.

243). In a psychiatric review technique the same day, Dr. Marlow opined Plaintiff had moderate

9

difficulties maintaining social functioning and concentration, persistence, or pace, but only mild restriction in activities of daily living and no episodes of decompensation of extended duration. (Tr. 255).

On September 20, 2010 (having only seen her once since June 2010), Dr. Hill completed a medical source statement regarding Plaintiff's mental capacity. (Tr. 305–06; *see* Tr. 270). He rated her abilities as "poor" with regard to dealing with work stress, completing a normal workday and work week without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. (Tr. 305–06). He rated her abilities as "fair" with regard to relating predictably in social situations, behaving in an emotionally stable manner, working in coordination with or proximity to others without being unduly distracted or distracting, interacting with supervisors, relating to co-workers, dealing with the public, maintaining regular attendance and being punctual within customary tolerances, and maintaining attention and concentration for extended periods. (Tr. 305–06). And he rated her as "unlimited" or "good" in the remaining categories of functioning. (Tr. 305–06). Overall, Dr. Hill stated Plaintiff "experiences depressive symptoms that can be nearly immobilizing, with very low motivation/energy/ability to interact [and] do work." (Tr. 306).

Plaintiff's Reports to the Social Security Administration (SSA)

Plaintiff alleged bipolar depression limited her ability to work. (Tr. 130). In the Disability Report she filed with the SSA, Plaintiff stated she stopped working August 10, 2009 because it was a seasonal job. (Tr. 131). But she also said she believed her conditions became severe on October 10, 2008. (Tr. 131).

Plaintiff reported living in a house with her two children, and said her mother helped her

10

around the house. (Tr. 153). Plaintiff reported she spent her days caring for her daughter, going to appointments, attending a training program four days a week, cleaning, and completing other household chores. (Tr. 154). She stated her mother watched her daughter while she attended her program and sometimes took her to run errands. (Tr. 154). Plaintiff reported difficulty sleeping, indicating she sometimes slept only three to four hours per night. (Tr. 154). Plaintiff described no limitations in personal care, but stated she needed reminders to attend appointments and take her medication. (Tr. 155). She reported preparing her own meals food and for her daughter. (Tr. 155). This included one full course meal every other day for herself and frozen dinners alternately, but she stated she prepared food every single day for her daughter. (Tr. 155). Plaintiff also reported she could clean, do laundry, iron, and do dishes, and stated she did these chores daily. (Tr. 156). She reported she sometimes felt overwhelmed. (Tr. 156).

Plaintiff reported riding in a car, using public transportation, and sometimes driving herself, though she did not have a valid license. (Tr. 156; *see* Tr. 28). Twice a month, she shopped in stores for groceries and household items. (Tr. 156). Plaintiff's hobbies included watching television and movies, going to the mall, and attending sporting events. (Tr. 157). Though she watched television daily, she stated she no longer went to events or participated in any of her former hobbies. (Tr. 157). She reported spending time with others, but not often, and said she often did not want to go in public. (Tr. 157). Plaintiff indicated her condition affected her ability to get along with others. (Tr. 157). Plaintiff also stated her condition affected her understanding, memory, and concentration, but she did not claim her conditions affected her ability to follow instructions, complete tasks, or get along with others. (Tr. 158). She also stated she had difficulty dealing with stress and unexpected changes in routine, explaining these things caused her to become angry. (Tr. 159).

11

In June 2010, the SSA had difficulty reaching Plaintiff and she reported inconsistent information regarding her activities when they did reach her. (Tr. 169). First, she said she no longer went shopping and only left the house about once a week; then she said she attended a class every day "to keep her benefits." (Tr. 169). She said she talked on the phone but denied all social activities. (Tr. 169). She first said she had a boyfriend, then said she did not. (Tr. 169). Plaintiff was very upbeat, polite, and cooperative. (Tr. 169).

ALJ Hearing

At the hearing on August 4, 2011, Plaintiff testified she lived in a house with her two children. (Tr. 27). She testified she prepared meals only when she had to, explaining her mother and her children's father did most of the meal preparation and cleaning. (Tr. 29). Plaintiff testified she only did laundry once or twice a month, did the dishes a couple times a week, did not go shopping, and had no hobbies other than watching two or three hours of television per day. (Tr. 29–30). She did say she fed, bathed, and cared for her children when their father was not present. (Tr. 30–31). Plaintiff testified she lacked energy and was not in a mood to get up, move around, or be social on most days. (Tr. 31–32). She also said she rarely talked on the phone with friends anymore. (Tr. 31).

Plaintiff testified she last worked in 2009 at a summer job. (Tr. 32). When the ALJ asked her what she felt kept her from being able to work, Plaintiff stated "just mainly me being around other people". (Tr. 33). She explained she did not like being around people, had racing thoughts, and had difficulty concentrating. (Tr. 33). She described panic attacks in crowded places and difficulty remembering multi-step tasks. (Tr. 35). Plaintiff testified she attended counseling twice a month and saw her psychiatrist once or twice a month, but stated she reschedules appointments on days she feels like she cannot do anything. (Tr. 34, 36). Additionally, Plaintiff explained she sometimes lay

12

in bed all day and could not stop crying. (Tr. 37). When the ALJ asked Plaintiff about substance abuse, she testified she had used marijuana at most four times in her adult life. (Tr. 39). Noticing Plaintiff's onset date and the relatively short period between when she gave birth to her two children, the ALJ asked whether anyone had considered postpartum depression. (Tr. 39). Plaintiff replied no one had considered it, but she thought it could contribute to her symptoms. (Tr. 39).

The ALJ posed a hypothetical to the VE, asking him to consider a person of Plaintiff's age, education, and vocational background who could do a full range of work with the following limitations:

> [T]his person would need to perform simple routine tasks, simple short instructions, making simple work related decisions, having few workplace changes. This person was not interacting with the public, but could have superficial contact with coworkers and supervisors. This person was not working at a production rate pace.

(Tr. 40–41). The VE testified such a person could perform the jobs of Laundry Worker, Wire Worker, and Electronics Worker, each accounting for significant numbers of jobs in the national economy. (Tr. 41). In a second hypothetical, the ALJ added that the person would need three additional ten minute breaks each day at unpredictable intervals. (Tr. 41–42). The VE testified such a person could not perform any jobs. (Tr. 42). He also testified most employers would replace an employee who missed two days per month on a continuous basis. (Tr. 42).

ALJ Decision

The ALJ found Plaintiff's date last insured to be December 31, 2008. (Tr. 12). She found Plaintiff had not engaged in substantial gainful activity since October 1, 2008, the alleged onset date. (Tr. 12). The ALJ found Plaintiff suffered from one severe impairment – depressive disorder – but this impairment did not meet or medically equal a listed impairment. (Tr. 12). Specifically, the ALJ found Plaintiff had only mild difficulties in activities of daily living, moderate difficulties

13

maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 13). After considering the entire record, the ALJ found Plaintiff had the RFC to perform a full range of work at all exertional levels, with the following non-exertional limitations: "She can perform simple, routine tasks with short simple instructions. She can make simple work related decisions, have few work place changes. She cannot interact with the public, and she can only have superficial contact with coworkers and supervisors. She cannot work at a production rate pace." (Tr. 13–14).

The ALJ recognized inconsistencies in Plaintiff's story, noting Plaintiff initially stated she stopped working in October 2008 because her job was seasonal work, but alleged increased depression when her claim was being reconsidered. (Tr. 14). Additionally, the ALJ noted Plaintiff's belief that her symptoms could be due to postpartum depression and also noted Plaintiff's testimony that she attended counseling sessions twice a month. (Tr. 14). Then, the ALJ explained the record shows noncompliance with treatment and medication, noting Plaintiff never sought mental health treatment until she was court-ordered to do so in October 2009. (Tr. 14). The ALJ summarized the mental health records in some detail and reviewed Plaintiff's daily activities, finding Plaintiff could do household chores, care for her own needs and the needs of her children, and perform daily activities if she chose. (Tr. 15). The ALJ concluded Plaintiff was not credible in alleging an incapacity for all sustained work activity. (Tr. 15). Specifically, she noted while Plaintiff said she did not like being around people, the records "show[ed] a rather busy lifestyle" with a job-retraining program and the birth of her second child. (Tr. 15). The ALJ also noted medical evidence showed Plaintiff consistently reported medication helped her condition. (Tr. 15).

The ALJ gave some weight to Dr. Hill's medical source statement opining Plaintiff had poor

14

abilities to deal with stress, complete a normal work week without interruptions from psychological symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 15–16). The ALJ found the record did not support the need for additional rest periods, but incorporated the poor ability to deal with stress, poor ability perform at a consistent pace, and difficulty dealing with the public into the RFC. (Tr. 16). The ALJ gave considerable weight to the rest of Dr. Hill's opinion, finding it consistent with treatment notes. (Tr. 16). The ALJ also gave great weight to the consulting psychologist's opinion "as it [wa]s consistent with the record as a whole." (Tr. 16). Relying on VE testimony, the ALJ determined Plaintiff could perform jobs existing in significant numbers in the national economy. (Tr. 16–17). Thus, she found Plaintiff "not disabled". (Tr. 17). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as

15

substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including

16

inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff alleges the ALJ erred two ways. First, she alleges the ALJ improperly evaluated Dr. Hill's opinion regarding Plaintiff's poor ability to handle work stress and complete a work day. (Doc. 16, at 8–12). Second, she argues the ALJ improperly evaluated her credibility. (Doc. 16, at 12–15).

Plaintiff's Record Contains No Relevant Evidence for the DIB-Eligible Period

As a preliminary matter, the Court addresses Plaintiff's claim for DIB. To qualify for DIB, Plaintiff must have been under a disability as of the date her insured status expired on December 31, 2008. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a), 404.320(b)(2); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990). Plaintiff's medical record contained no evidence of treatment for a mental condition at any time on or before December 31, 2008. She did not start court-ordered mental health treatment until October 26, 2009, almost a year *after* her date last insured. (Tr. 266). The only medical evidence remotely mentioning Plaintiff's mental condition prior to 2009 consisted of psychiatric examination notes from her hospitalizations in November 2007 and June 2008. (Tr. 193, 211–12). In November 2007, her psychiatric examination was normal (Tr. 212), and in June 2008, Plaintiff was negative for sleep disturbance, anxiety, memory loss, disorientation, inattention, or feelings of depression (Tr. 193). Because the record contained no medical evidence demonstrating any mental work-related functional limitations during the relevant DIB period, Plaintiff has failed to demonstrate the Commissioner erred in determining she was not entitled to DIB.

17

<u>Treating Physician Rule</u>

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242. A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2).[2] In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight

---

2. 20 C.F.R. § 404.1527(d) – the regulation section defining the treating physician rule – was recently renumbered to § 404.1527(c) due to revisions not affecting the provision or rule. 77 FR 10650, at *10656 (Feb. 23, 2012). Many cases cite § 404.1527(d) to explain the rule but the undersigned will cite the current and correct citation throughout this order.

18

the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*.

An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009),

but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399,

409–10 (6th Cir. 2009). Good reasons are required even when the ALJ's conclusion may be justified

based on the record as a whole. The reason-giving requirement exists, in part, to let claimants

understand the disposition of their cases, particularly in cases where a claimant knows his physician

has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some

reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The

requirement also ensures the ALJ applied the treating physician rule and permits meaningful review

of the ALJ's application of the rule." *Id*.

Here, Plaintiff alleges the ALJ "failed to provide good reasons for departing from Dr. Hill's

opinion" that Plaintiff had a poor ability to complete a normal workday and work week without

interruptions from psychologically based symptoms, perform at a consistent pace without an

unreasonable number and length of rest periods, and deal with work stress. (Doc. 16, at 9). The ALJ

did give good reasons, though, specifically stating the record contained no support for the need for

rest periods. (Tr. 15–16). Moreover, the ALJ specifically incorporated restrictions stemming from

difficulties dealing with work stress and performing at a consistent pace. She restricted Plaintiff to

simple, routine tasks involving simple, short instructions and simple work-related decisions, in an

environment with few workplace changes, with no production pace requirements, no contact with

the public, and only superficial contact with supervisors and coworkers. (Tr. 13–14). Plaintiff has

not explained why the ALJ's RFC determination did not accommodate her issues with workplace

stress, instead merely arguing the ALJ was wrong to give certain parts of Dr. Hill's opinion some

19

weight rather than considerable weight. Plaintiff also overlooks Dr. Hill's opinion that Plaintiff had a good ability to socialize and a fair ability to behave in an emotionally stable manner and relate predictably in social situations. (Tr. 306). Dr. Hill even said Plaintiff had a good ability to understand, remember, and carry out complex job instructions. (Tr. 306).

As already stated, the ALJ said the record did not support the need for rest periods stemming from psychologically-based symptoms. First, no evidence suggested Plaintiff left her last job due to mental impairments. She specifically stated she left the job because it was a seasonal position. (Tr. 131, 266). In fact, despite alleging she became disabled on October 1, 2008, Plaintiff did not seek any mental health treatment until she was court-ordered to do so in October 2009. (Tr. 266–67, 300). Until later stages of her disability claim proceedings, Plaintiff claimed she maintained a robust level of daily activities despite her symptoms. On the Function Report she completed in March 2010, Plaintiff stated she could care for her daughter, attend appointments, attend a three-hour training program four days a week, and perform other household chores including dishes, cleaning, laundry, and ironing. (Tr. 154, 156). She also reported no problems with personal care, running errands and shopping, preparing meals daily for her daughter, using public transportation, and socializing with others. (Tr. 154–57). When asked to circle activities limited by her symptoms, Plaintiff did *not* indicate she had difficulty completing tasks, following instructions, or getting along with others. (Tr. 158). She did say she had difficulty handling stress, but indicated she gets along well with authority figures. (Tr. 158–59). Based on this evidence, consulting psychologist Dr. Marlow opined Plaintiff could complete many activities despite her symptoms. (Tr. 243).

Furthermore, treatment notes did not support the level of limitation Dr. Hill assessed. Plaintiff never sought mental health treatment until the court ordered her to do so. (Tr. 266). When

she first saw Dr. Hill, her chief complaint was anger issues, not depression, and her mood was euthymic at that appointment. (Tr. 298–99). Plaintiff also began her first counseling session with Hyland by referring to anger problems. (Tr. 294). She consistently reported no current suicidal ideation and always reported no suicidal intent or plans. (Tr. 238, 261, 267, 293–94, 298, 315, 317). Plaintiff was generally cooperative and pleasant; had intact concentration, attention, insight, and judgment; had logical and goal-directed thought processes; and expressed herself well. (Tr. 239, 299, 315). Plaintiff also generally reported medication improved her symptoms, though she continued to believe there was room for improvement. (Tr. 239–40, 261, 263). Further, Plaintiff did not comply with her treatment. She told Dr. Hill she took Seroquel only fairly consistently, with an inconsistent dosage. (Tr. 270). There was also a three month gap in her treatment with Dr. Hill (Tr. 270), she repeatedly cancelled or failed to show up for her counseling appointments, and she was ultimately discharged from counseling because of noncompliance (Tr. 238, 240, 260, 272–73, 278, 284, 307–08). To the extent Plaintiff relies on the GAF of 45 Dr. Wilhelm assigned her on March 7, 2011, this assessment occurred at a time Plaintiff had not taken any medication for months and had stopped going to counseling – effectively ceasing all treatment for her depression. (Tr. 311–14, 317).

Ultimately, substantial evidence supports the ALJ's decision to afford certain parts of Dr. Hill's opinion only some weight. The ALJ accurately noted the record failed to support the need for frequent breaks. Moreover, the ALJ specifically addressed the remainder of the functional abilities Dr. Hill assessed as poor. With regard to a poor ability to deal with stress and complete a normal workday and workweek without interruptions from psychologically based symptoms, the ALJ limited Plaintiff to simple, short instructions; simple work-related decisions; and few workplace changes. (Tr. 14–16). With regard to a poor ability to perform at a consistent pace, the ALJ found

21

Plaintiff was not to work at a production rate pace. (Tr. 14, 16). The ALJ even went beyond the limitations Dr. Hill discussed, crediting Plaintiff's statement that she felt unable to work primarily because she did not want to be around large groups of people by restricting Plaintiff from contact with the public despite Dr. Hill's belief she had a good ability to socialize and a fair ability to behave in an emotionally stable manner. (Tr. 14, 16). The ALJ sufficiently explained her decision, gave good reasons for the weight she assigned Dr. Hill's opinion, and did not err.

Credibility Analysis

Plaintiff also argues the ALJ erred in finding her not credible. (Doc. 16, at 12–15). The "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476. An ALJ's credibility determinations about the claimant are to be accorded "great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.' However, they must also be supported by substantial evidence." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (quoting *Walters*, 127 F.3d at 531); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004) ("[W]e accord great deference to [the ALJ's] credibility determination.").

Social Security Ruling 96-7p clarifies how an ALJ must assess the credibility of an individual's statements about pain or other symptoms:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. § 404.1529(c) and § 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other

22

symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3. An ALJ is not required, however, to discuss each factor in every case. *See Bowman v. Chater*, 1997 WL 764419, at *4 (6th Cir. 1997); *Caley v. Astrue*, 2012 WL 1970250, *13 (N.D. Ohio 2012).

Here, Plaintiff alleges the ALJ "selectively consider[ed] evidence of her symptoms and improperly rel[ied] upon false contradictions" in her statements. (Doc. 16, at 13). Simply put, the ALJ did not err assessing Plaintiff's credibility. She addressed Plaintiff's daily activities, finding Plaintiff could care for herself and her children and perform household chores if she chose. (Tr. 15, 154–56). She noted Plaintiff testified she attended counseling sessions twice monthly, but also documented Plaintiff's inconsistent treatment history. (Tr. 14–15, 34, 238, 240, 260, 272–73, 278, 284, 307–08). Plaintiff takes issue with the ALJ stating medical records show a busy lifestyle due to Plaintiff attending classes and giving birth to her second child. (Doc. 16, at 13). But even disregarding Plaintiff's job training classes and the birth of her child, her function report still showed a level of functioning inconsistent with someone completely disabled. Likewise, Plaintiff's argument regarding the ALJ's comments about postpartum depression does not sway the Court. The fact

23

remains that Plaintiff repeatedly said she stopped working for reasons wholly unrelated to depression. On her initial report to the SSA, she said it was because the job was a seasonal position (Tr. 131); she told her counselor she stopped working due to being laid off (Tr. 266); and she told the ALJ her last job ended because it was "something just for the summer" (Tr. 32).

The record also reflected additional inconsistencies in Plaintiff's statements. Her testimony completely contradicted her Function Report, stating her mother and boyfriend took care of all household chores where she previously stated she was able to and did perform many of the household duties daily. (*See* Tr. 29, 154–56). In June 2010, Plaintiff provided inconsistent information to the SSA regarding her activities. First she said she only left the house once a week; then she said she attended a class every day. (Tr. 169). She denied all social activities, but said she had a boyfriend and talked on the phone. (Tr. 169). First she said she had a boyfriend; then she said she did not. (Tr. 169).  Plaintiff told the ALJ she generally went to counseling twice a month, though she sometimes rescheduled (Tr. 34), but she routinely missed appointments (Tr. 238, 240, 260, 272–73, 278, 284, 307–08). She sometimes reported medication compliance (Tr. 238–40), but told Dr. Hill she took varying doses of her antidepressant medication only "fairly consistently" (Tr. 270). And when Plaintiff started counseling at age 23, she reported she smoked marijuana approximately once a week (Tr. 267), but she told the ALJ she had smoked it at most four times in her entire adult life (Tr. 39).

By addressing Plaintiff's daily activities and their inconsistency with a person totally disabled, and by also addressing the issues of Plaintiff's treatment noncompliance, the ALJ sufficiently explained her credibility determination. The record as a whole revealed a litany of inconsistencies providing substantial evidence supporting the ALJ's conclusion that Plaintiff was

24

not entirely credible. Therefore, the ALJ did not err.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision denying benefits.

IT IS SO ORDERED.

_____s/James R. Knepp, II_____
United States Magistrate Judge
